IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01583-PAB-KMT

JIMMY RICHARDSON,

     Plaintiff,

v.

DHS DRILLING COMPANY, a Colorado corporation,

     Defendant.

_____

**ORDER**

_____

This matter is before the Court on the Motion for Summary Judgment [Docket No. 47] filed by defendant DHS Drilling Company ("DHS"). This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

# I. BACKGROUND[1]

This case arises from an accident that occurred at an oil and gas well site near Craig, Colorado, severely injuring plaintiff Jimmy Richardson.

In 2011, DHS provided oil and natural gas well drilling and well relocation services. Docket No. 47-1 at 12. Quicksilver Resources, Inc. ("Quicksilver") leases well sites and hires subcontractors to drill wells and perform work at the well site. Docket No. 47-5 at 9, 36:8-13. JD Field Services ("JDFS") is a trucking company. Docket No. 47-2 at 10, p. 38:7-13. Mr. Richardson was employed by JDFS at the time of the accident. Docket No. 47 at 2, ¶ 7. He received no special training from JDFS. Docket

_____

[1]The following facts are undisputed unless otherwise indicated.

No. 47 at 3, ¶ 8.

Quicksilver leased and operated an oil and gas well site near Craig, Colorado (the "well site").  Docket No. 60 at 8, ¶ 2.  On April 15, 2011, Quicksilver and DHS executed a Drilling Bid Proposal and Daywork Drilling Contract (the "daywork contract"), which obligated DHS to provide, maintain, and operate drill rigs.  Docket No. 47 at 2, ¶ 3; *see also* Docket No. 50-2.  On July 18, 2011, the daywork contract was amended to cover DHS Rig #6 ("Rig No. 6"), which was located at the well site.  Docket No. 50-2 at 13.  Quicksilver instructed DHS to maintain and operate Rig No. 6 according to certain parameters.  Docket No. 47-5 at 10, p. 38:9-13.  The daywork contract provided that, when DHS concluded operations at the well site, Quicksilver would be liable for personal injuries that occur as a result of conditions at the well site, but that if DHS reenters the well site "for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period." Docket No. 50-2 at 4, ¶ 12.

DHS's safety manual (the "safety manual") in effect at the time was designed to ensure a safe environment for "visitors, contractors, and employees" to DHS's worksites.  *See* Docket No. 50-4 at 7, 9.  The safety manual required DHS's drilling safety managers to "identify unsafe conditions and practices and determine remedies." *Id.* at 8.  The safety manual also contained a "Contractor/Sub-Contractor Personnel" section, the purpose of which was to "ensure a safe working environment for all employees of contractors/sub-contractors working on DHS drilling locations; all contractor/subcontroactors employees will be subject to all terms and conditions of this policy."  Docket No. 50-4 at 17.  DHS's president and CEO William Sauer Jr. was

2

DHS's Federal Rule of Civil Procedure 30(b)(6) witness and testified that this section of the safety manual applied only to those contractors or subcontractors hired by DHS. Docket No. 47-2 at 15, pp. 59:10-60:9.  DHS had a "Forklift Policy" to "designate and train each DHS Drilling employee who will operate a forklift on Company worksites." Docket No. 50-4 at 19.  Under the Forklift Policy, the Rig Manager was the only person permitted to provide loading or unloading instructions to forklift operators.  *Id.* at 21. The Forklift Policy does not mention contractors or subcontractors.  *Id.* at 19, 21-22. Mr. Sauer testified as follows: "Q.  . . . Do you know if JD was provided a copy of the DHS safety manual?  A.  Probably not.  Q.  Would you expect JD to comply with some of the provisions in the DHS safety manual?  A.  I would hope so."  Docket No. 47-2 at 15, p. 58:15-20.

Quicksilver determined that Rig No. 6 should be moved from the well site near Craig, Colorado to a different location in Moffat County, Colorado.  As a result, on April 15, 2011, Quicksilver contracted with DHS to relocate Rig No. 6, which consisted of disassembling Rig No. 6 at the well site, digging a site at the new Moffat County, Colorado location, and reassembling Rig No. 6 at the new site.  Docket No. 47-1 at 9; Docket No. 47 at 2, ¶ 4.  DHS's relocation services duties were limited to disassembly of the rig at the well site and reassembly of the rig at the new site.  Docket No. 47 at 2, ¶ 5.  On August 1, 2011, DHS began disassembling Rig No. 6 and rented a forklift from JDFS to assist in the process.  *Id.* at 2, ¶ 6; Docket No. 47-1 at 9.  As part of the disassembly process, DHS held daily pre-job planning meetings.  Docket No. 47-2 at 7, ¶ 28:4-19.  It is not clear from the record who attended these meetings or when DHS finished disassembling Rig No. 6.  Quicksilver contracted with JDFS to remove the

disassembled Rig No. 6 from the well site and to transport it to the new well site.

Docket No. 50 at 5, ¶¶ 3-4; Docket No. 47-5 at 10, p. 38:18-21; *see also* Docket No. 47-2 at 10, p. 38:4-21 (testifying that Quicksilver, not DHS, hired JDFS).

The accident giving rise to this case occurred on August 10, 2011.  No DHS employees were present at the well site at the time of the accident.  Docket No. 50 at 8, ¶ 19.  Although Mr. Richardson has no independent memory of the accident, according to witnesses, Mr. Richardson was operating a winch truck[2] at the well site.  Docket No. 60 at 8, ¶ 8.  JDFS employee Troy Nilson, while operating a JDFS forklift,[3] lifted a spreader beam[4] weighing approximately 5000 pounds for the purpose of loading the spreader beam onto the truck Mr. Richardson was operating.  Docket No. 47 at 3, ¶ 10; Docket No. 50-5 at 6.  According to Mr. Nilson, while Mr. Nilson was lowering the spreader beam, Mr. Richardson was outside of his truck walking between the beam and the trailer, Docket No. 47-7, moving chains out of the way.  Docket No. 60 at 8, ¶ 10.  Mr. Richardson testified that it is not his practice to walk between a trailer and a forklift during loading.  Docket No. 47-3 at 15, pp. 56:18-57:10.  According to Mr. Nilson, the spreader beam began to slide off of the forks and struck Mr. Richardson in the head, knocking him down.  Docket No. 47-7.  The spreader beam then slid completely off the forks and landed on Mr. Richardson's leg.  *Id.*

---

[2]A winch truck is a truck equipped with a gear-driven or hydraulic winch designed for self-loading and unloading.  Docket No. 47-3 at 4, p. 10:4-8.

[3]The parties agree that the forklift Mr. Nilson was operating was not the same forklift that JDFS had leased to DHS.  Docket No. 47 at 3, ¶ 11.

[4]Spreader beams are part of a drilling rig's substructure.  Docket No. 47-3 at 9, p. 31:6-8.

Mr. Sauer testified that, generally speaking, he would consider the use of a forklift to move a spreader beam without tying the beam down to be an unsafe condition or practice.  Docket No. 47-2 at 16, p. 63:18-24.  Mr. Sauer testified that it was the trucking company's responsibility to load a spreader beam.  However, he said that, if DHS were to move a spreader beam, it would use a crane or gin truck.[5]  *Id.* at 9-10, pp. 36:15-37:2.  Mr. Richardson's expert witness Edward Ziegler states that Rig No. 6's components were of "unique sizes, weights, and configurations" and "did not have lifting points (i.e., pad-eyes or hooks), nor markings, nor painted information or instructions such as for indicating balance or lift points to those contractors provided the rig components to move."  Docket No. 51-1 at 2, ¶ 6.b.  In Mr. Ziegler's opinion, the spreader beam fell on Mr. Richardson because DHS would have moved the spreader beam with a crane or winch truck – not a forklift – and "there were no lift points for the equipment, and no safety information (including no DHS person at the site) as to how to handle the equipment."  Docket No. 50-6 at 5, ¶ 13; Docket No. 50-5 at 10, ¶ 14.

As a result of the accident, Mr. Richardson sustained a concussion, traumatic brain injury, and an injury to his left leg that required doctors to amputate the leg above the knee.  Docket No. 47 at 3, ¶ 14; Docket No. 60 at 8, ¶ 12.

On June 17, 2013, Mr. Richardson filed suit against DHS and Quicksilver for their role in the August 10, 2011 accident.  Docket No. 1.  Mr. Richardson brought claims for negligence, gross negligence, and premises liability against DHS and Quicksilver.  *Id.* at 6-9.  On October 30, 2014, Mr. Richardson and Quicksilver jointly

---

[5]A gin truck is a truck with a crane-like device attached.  Docket No. 47-2 at 9, p. 33:3-4.

dismissed Mr. Richardson's claims against Quicksilver.  Docket No. 56.

On August 26, 2014, DHS filed the present motion.  Docket No. 47.  DHS seeks

summary judgment on all of Mr. Richardson's claims against it.  *Id.* at 15.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate

burden of persuasion at trial, it may satisfy its burden at the summary judgment stage

by identifying a lack of evidence for the nonmovant on an essential element of the

nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th

Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998))

(internal quotation marks omitted).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a

6

material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513,

1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The

nonmoving party may not rest solely on the allegations in the pleadings, but instead

must designate "specific facts showing that there is a genuine issue for trial."  *Celotex,*

477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the

nonmovant must establish, at a minimum, an inference of the presence of each

element essential to the case."  *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart,*

*Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and

any reasonable inferences that might be drawn from them in the light most favorable to

the nonmoving party."  *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th

Cir. 1994).

**III.  ANALYSIS**

   **A.  Premises Liability**

   Colorado's premises liability statute states: "In any civil action brought against a

landowner by a person who alleges injury occurring while on the real property of

another and by reason of the condition of such property, or activities conducted or

circumstances existing on such property, the landowner shall be liable only as provided"

by statute.  Colo. Rev. Stat. § 13-21-115(2).  The statute is intended to provide

"comprehensive and exclusive specification of the duties landowners owe to those

injured on their property."  *Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004); *see also*

*Casey v. Christie Lodge Owners Ass'n, Inc.*, 923 P.2d 365, 368 (Colo. App. 1996)

(denying plaintiff leave to add claims for negligent supervision and negligent retention

because such claims "related to the condition of the property, or the activities conducted or circumstances existing on the property" and would have been barred by premises liability statute).

Colorado's premises liability statute defines the term landowner as, "without limitation, an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property."  Colo. Rev. Stat. § 13-21-115(1).  As to the first portion of this definition, courts have held that "possession need not necessarily be to the exclusion of all others."  *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1220 (Colo. 2002).  Rather, possession means "occupation of the land with intent to control it."  *Henderson v. Master Klean Janitorial, Inc.*, 70 P.3d 612, 614 (Colo. App. 2003); *see also Pierson*, 48 P.3d at 1219-20 (citing favorably Restatement (Second) of Torts § 328E (1965), which defines possessor of land as "a person who is in occupation of the land with intent to control it or . . . a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or . . . a person who is entitled to immediate occupation of the land, if no other person is in possession").

In *Pierson*, landowners leased a gravel pit to Montrose County, Colorado, which in turn entered into an agreement with Black Canyon Aggregates, Inc. ("Black Canyon") authorizing Black Canyon to crush gravel at County-owned or leased gravel pits.  48 P.3d at 1216.  The County did not assign its lease to Black Canyon, but the agreement between the two entities permitted Black Canyon to reenter gravel pits to correct any dangerous condition.  *Id.* at 1217.  Plaintiff was injured when driving on a road through

8

a gravel pit, a gravel pit which Black Canyon had mined on several occasions over the years. *Id.* The Colorado Supreme Court held that, for purposes of summary judgment, Black Canyon was in sufficient possession of the gravel pit so as to be a landowner under § 13-21-115(1). *Id.* at 1221.

Mr. Richardson argues that DHS retained premises liability based upon a provision of the daywork contract between DHS and Quicksilver that provides that DHS is relieved of liability for the conditions of the location when DHS has "concluded operations at the well location," unless DHS "shall subsequently reenter upon the location for any reason, including removal of the rig," during which time "any term of the Contract relating to such reentry activity shall become applicable." Docket No. 50-2 at 4, ¶ 12. However, Mr. Richardson does not identify "any term of the Contract" that would suggest that DHS was contractually liable for injuries to Quicksilver's contractors such as JDFS. To the contrary, the contract states that, as the operator, Quicksilver shall release DHS of any liability arising in connection with "Operator's employees or Operator's contractors." *See* Docket No. 50-2 at 4-5, ¶ 14.9. Thus, the Court is not convinced that the term of the daywork contract upon which Mr. Richardson relies rendered DHS in possession of the well site at the time of the accident.

According to DHS's interrogatory responses, DHS "disassembled Rig # 6 and left the disassembled rig at the Well Site. . . . DHS was at the new well site when the incident occurred." Docket No. 47-1 at 9-10. Mr. Richardson provides no evidence suggesting that DHS had an ongoing presence at the well site on the day of the accident and argues elsewhere in his brief that DHS "abandoned" the well site." *See* Docket No. 50 at 11. As a result, there is no basis upon which to conclude that DHS

9

was in "possession" of the well site at the time of the accident.  *See* § 13-21-115(1).

As to the second portion of this definition, the person whom plaintiff is seeking to hold liable must be "legally entitled to be on the real property" and "responsible for creating a condition on real property or conducting an activity on real property that injures an entrant." *Pierson*, 48 P.3d at 1221.  In other words, liability is placed upon "the person or entity that created the condition or conducted the activity on the real property that, in turn, caused injury to someone." *Id.*  The injury-causing activities and circumstances need not be "directly or inherently related to the land"; rather, "the statute includes activities or conditions that the 'landowner' is conducting or creating on the property in its capacity as a 'landowner.'" *Larrieu v. Best Buy Stores, L.P.*, 303 P.3d 558, 563-64 (Colo. 2013); *see, e.g.*, *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1266 (Colo. App. 2010) (holding that church that contracted with ranch owner to hold youth group event at ranch was "landowner" under premises liability statute).

Mr. Richardson argues that DHS is legally responsible for the condition of the property because "its own drill rig creates the danger on the property" and the mere presence of the drill rig was the "circumstance" that created the dangerous condition. Docket No. 50 at 14.  There is no dispute that, by virtue of the daywork contract, DHS was "legally conducting an activity on the property" by disassembling Rig No. 6 and created a condition on the property by leaving the disassembled rig parts at the well site.  *See Larrieu*, 303 P.3d at 564 (quotations omitted); *Henderson*, 70 P.3d at 615 (concluding that company contracted to provide janitorial services was "landowner"

when it failed to mop up spilled water that caused plaintiff to slip).  As a result, there is

sufficient evidence upon which to conclude that DHS is a landowner by virtue of being

legally responsible for the condition of, or for circumstances existing on, the well site.

*See* § 13-21-115(1).

The Court turns to DHS's duty of care.  A landowner's duty of care is determined

by the status of the injured party.  *Vigil*, 103 P.3d at 325.  The parties agree that Mr.

Richardson was an "invitee,"[6] Docket No. 47 at 10; Docket No. 50 at 16, which means

that he may recover for damages "caused by the landowner's unreasonable failure to

exercise reasonable care to protect against dangers of which he actually knew or

should have known."  § 13-21-115(3)(c)(I); *see also Vigil*, 103 P.3d at 326.  The issue is

whether DHS's act of leaving the spreader beam at the drill site to be transported by

JDFS was a breach of its duty of care.  DHS argues that it did not know or have reason

to know that leaving the rig for JDFS to load and transport would create a danger.

Docket No. 47 at 11.  DHS knew that using a forklift to move a spreader beam without

tying the beam down was unsafe, Docket No. 47-2 at 16, p. 63:18-24, and, in fact,

considered it a better practice to move a spreader beam with a crane or gin truck.  *Id.* at

9-10, pp. 36:15-37:2.  DHS also knew that it would have been "the trucking company's

responsibility" to move the spreader beam. Docket No. 47-2 at 9, p. 36:8-20.  However,

Mr. Richardson fails to present any evidence that the spreader beam was deceptively

---

[6]An "invitee" is "a person who enters or remains on the land of another to
transact business in which the parties are mutually interested or who enters or remains
on such land in response to the landowner's express or implied representation that the
public is requested, expected, or intended to enter or remain."  Colo. Rev. Stat. § 13-21-
115(5)(a).

dangerous such that DHS's act of leaving the spreader beam for JDFS to move created

an unreasonable, foreseeable risk of injury to Mr. Richardson that DHS knew or should

have known about.  Instead, the evidence shows that the spreader beam was what it

appeared to be – a heavy metal beam.  Mr. Richardson has presented no evidence,

from Mr. Ziegler or anyone else, that the beam was deceptively heavy,

uncharacteristically unbalanced, or otherwise presented a hazard that a company that

moved drill rigs would not typically encounter.

Mr. Ziegler is of the opinion that JDFS has "trained and experienced" personnel

Docket No. 50-5 at 10, and "is a specialist at moving drilling rigs."  Docket No. 50-6 at 4,

¶ 5.  Mr. Ziegler also noted that "J.D. Field Services goes to many different drilling rig

locations and moves different types and configurations of rigs."  Docket No. 50-5 at 10,

¶ 13.  Troy Nilson, the JDFS forklift driver who attempted to load the spreader beam

onto the truck that Mr. Richardson was operating, recognized the spreader beam for

what it was: "I was operating a Forklift unloading a *spreader* from the derrick off the

trailer."  Docket No. 47-7 (emphasis added).  There is no evidence from Mr. Nilson that

the spreader beam displayed qualities that he did not expect.  To that end, it is

reasonable to assume that DHS believed persons familiar with loading and transporting

drill rigs would handle the spreader beam.  Mr. Richardson does not suggest otherwise.

Mr. Ziegler states that Rig No. 6's components were of "unique sizes, weights, and

configurations," Docket No. 51-1 at 2, ¶ 6.b,[7] but this description, without more, does

---

[7]DHS does not challenge the admissibility of Mr. Ziegler's opinions pursuant to Fed. R. Evid. 702 or on any other basis.  Rather, DHS argues that Mr. Ziegler's opinion that DHS owed a common law duty of care to Mr. Richardson does not create a genuine dispute of material fact.  Docket No. 54 at 6-7.  Mr. Ziegler's opinions related to

not create an unreasonable risk of harm such that DHS had a duty to warn or supervise JDFS while the spreader beam was being loaded.  Mr. Ziegler states that Rig No. 6's components "did not have lifting points (i.e., pad-eyes or hooks), nor markings, nor painted information or instructions such as for indicating balance or lift points to those contractors provided the rig components to move."  *Id.*  However, their absence does not, by itself, suggest that DHS knew or had reason to know that the entity Quicksilver hired to load and transport the spreader beam would do so in an unsafe manner if left unwarned and unsupervised.  Moreover, Mr. Sauer testified that DHS was not in a position to instruct JDFS on how to load rig pieces, Docket No. 47-2 at 26, pp. 102:23-103-7, and that "normally on a rig move, when you hire a trucking company, they bring a forklift with their trucks to move equipment . . . period." *Id.* at 11, p. 43:10-14.  Mr. Richardson does not directly rebut Mr. Sauer's testimony on this point.  As a result, Mr. Richardson has failed to raise a genuine dispute of material fact as to whether DHS knew or should have known that leaving the spreader beam at the well site for JDFS to move would create a danger, or that the failure to warn or supervise JDFS during its loading of the spreader beam was unreasonable under the circumstances.

In order for liability to attach based upon a condition on a landowner's property, the condition must cause the entrant's injury.  *See Pierson*, 48 P.3d at 1221.  In Mr. Ziegler's opinion, the accident occurred because (1) DHS would ordinarily wrap chains around the spreader beam and move it with a crane or gin truck and (2) the spreader beam had no lift points and DHS provided no safety information regarding how to

---

common law duties of care are discussed below.

properly move the beam.  Docket No. 50-6 at 5, ¶ 13.  However, because DHS had no duty to warn or supervise JDFS during loading of the spreader beam, it would be improper to posit that, had DHS warned or supervised JDFS, the spreader beam would have been loaded differently.  Mr. Ziegler's causation opinion therefore lacks a sufficient factual connection to this case.  Mr. Sauer did not testify that the spreader beam could not have been safely loaded with a forklift if, for example, the forklift operator tied the spreader beam to the forks.  Rather, Mr. Sauer suggested that a gin truck could have been used to safely load the spreader beam, which was a piece of equipment that was on site and in use by JDFS at the time.  Thus, because there is evidence that the beam could have been safely loaded with the equipment JDFS was using at the time, there is no basis to conclude that the absence of lift points or instructions on the spreader beam was a cause of the accident.  As a result, Mr. Richardson provides no evidence that creates a genuine dispute of material fact that the condition DHS created at the well site was a cause of his injuries.

For the foregoing reasons, DHS's motion for summary judgment on Mr. Richardson's premises liability claim is granted.

### B.  Common Law Claims

Because premises liability claims are the exclusive remedy against a landowner for injuries suffered while on a landowner's property, *see Vigil*, 103 P.3d at 328, the question becomes whether Mr. Richardson may additionally proceed against DHS under a common law negligence theory.  Courts differ somewhat in their approach to this question.  The Tenth Circuit, in an unpublished decision applying Colorado law, held that, despite the plaintiff's inability to recover on a premises liability claim, plaintiff's

14

breach of contract claim for injuries suffered from an electrical fire while sleeping in a rented condominium was preempted by § 13-21-115. *Wyle v. Skiwatch Condo. Corp.*, 183 F. App'x 760, 761 (10th Cir. 2006) (unpublished); *see also Danielson v. Wal-Mart Stores, Inc.*, No. 06-cv-00053-EWN-PAC, 2006 WL 2385215, at *5 (D. Colo. Aug. 17, 2006) (dismissing negligent hiring and negligent supervision claims against store owner as preempted by § 13-21-115); *Casey*, 923 P.2d at 367 (denying plaintiff leave to add claims for negligent supervision and negligent retention).  However, the Colorado Court of Appeals has suggested that it would be unfair to compel plaintiff to elect between premises liability and general negligence claims before issues relating to defendant's status as a "landowner" are resolved.  *See Wycoff*, 251 P.3d at 1268.  Here, because there is at least some question as to whether DHS was a landowner under § 13-21-115, the Court concludes that it would be inappropriate to categorically bar Mr. Richardson from asserting a common law negligence claim against DHS.  Nonetheless, even if DHS is not subject to a duty of care under § 13-21-115(1), the question becomes what, if any, duty would it have to warn or supervise JDFS's loading of the spreader beam after DHS ceased operations at the well site.

A tort duty may be derived from "a legislative enactment of the standard of conduct or from a judicially imposed standard."  *Dare v. Sobule*, 674 P.2d 960, 963 (Colo. 1984).  "[T]he question is essentially one of fairness under contemporary standards – that is, would reasonable persons recognize and agree that a duty of care exists."  *Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993).  A court should base its determination on factors such as "the risk involved, the foreseeability and likelihood of

injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm, and the consequences of placing the burden of a duty on the defendant." *Ryder*, 54 P.3d at 890.  Courts may also consider "competing individual and social interests implicated by the particular facts of the case." *Id.*  "Upon finding the existence of a duty, a court must then consider the scope of that duty and define the applicable standard of care." *Greenberg*, 845 P.2d at 536.

In Colorado, a legal duty exists to use reasonable care "in response to a foreseeable and unreasonable risk of harm to others." *United Blood Servs., a Div. of Blood Sys., Inc. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992).  However, Colorado courts recognize a distinction between misfeasance – "'misconduct working positive injury to others'" – and nonfeasance – "'passive inaction or a failure to take steps to protect [a party] from harm.'" *Lego v. Schmidt*, 805 P.2d 1119, 1122 (Colo. App. 1990) (quoting *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987)); *see also Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002) ("in misfeasance the actor has created a new risk, and in nonfeasance the actor has simply preserved the status quo").  Whether a defendant is accused of engaging in misfeasance or nonfeasance is a "critical factor" in determining "whether a defendant owes a duty to a particular plaintiff." *Whitlock*, 744 P.2d at 57.

In *Collard*, the Colorado Court of Appeals applied the foreseeability rule to the activities of contractors, holding that "contractors owe a duty of care to third parties who could foreseeably be injured by negligent construction, installation, repair, or performance on service contracts, even after the contractors' work has been completed

and accepted by their employers." 292 P.3d at 1244.  In the road construction context,

the court held that the contractor's work

> created a dangerous condition, it had a tort duty, for a reasonable period of
> time, either to eliminate the condition or to warn foreseeable users . . . of the
> road hazards that foreseeably could result in injuries, even if its work had
> been completed and accepted by the City; however, this duty will not be
> imposed if [the contractor] had a reasonable good-faith belief that another
> authorized party . . . would promptly take the necessary measures to
> eliminate the dangerous condition or provide adequate warnings to
> foreseeable users.

*Id.* at 1245.

Mr. Richardson's argument that DHS owed him a common law duty in tort is

vague.  He argues that the nature of the relationship between him and DHS imposed a

duty on DHS, but does not clearly explain what relationship existed and precisely what

duty DHS had to Mr. Richardson.  *See* Docket No. 50 at 10.  Mr. Richardson makes no

attempt to apply the traditional four-factor test to the facts of this case, which, by itself,

is a sufficient basis to reject his argument that DHS was under a common law duty of

care with respect to the accident.  *Cf. Ryder*, 54 P.3d at 890.

Nonetheless, regardless of whether Mr. Richardson accuses DHS of

misfeasance or nonfeasance, the Court concludes the four factors do not weigh in favor

of imposing a duty of care on DHS to supervise or otherwise warn JDFS during loading

of the spreader beam.  As for the risk involved, there is no doubt that work on well sites

can be dangerous.  However, such risks are not to the general public, but to entities like

JDFS that are experienced at working in such conditions.  With regard to the

foreseeability and likelihood of injury as weighed against the social utility of DHS's

conduct, as discussed above, there is evidence to suggest that JDFS "is a specialist at

17

moving drilling rigs," Docket No. 50-6 at 4, ¶ 5, and its personnel are "trained and experienced."  Docket No. 50-5 at 10, ¶ 14; *see also* Docket No. 47-2 at 9, p. 36:15-25. As a result, it is not reasonably foreseeable that an entity with JDFS's experience transporting drilling rigs would be unable to properly handle a spreader beam and there is no indication that DHS lacked a good faith belief that companies such as JDFS could safely handle the spreader beam.  *Cf. Collard*, 292 P.3d at 1246 (noting that entrusting another contractor with taking sufficient steps to minimize a risk is "usually sufficient to warrant the contractor in assuming that [such steps] will be taken" (quotations omitted)). Moreover, given the fact that DHS did not hire JDFS, Mr. Richardson does not establish that DHS would have any ability to supervise JDFS.  *See* Docket No. 47-2 at 26, pp. 102:23-103-7.  In terms of the magnitude of the burden of guarding against the harm, JDFS appears to be in the best position to ensure that the transportation of rig components is done safely, especially in light of the fact that Mr. Richardson has failed to establish that the spreader beam in question was deceptively dangerous.  As for the consequences of placing the burden of a duty on the defendant, given the fact that Quicksilver contracted with and paid JDFS – not DHS – to load and transport the rig, Mr. Richardson has not shown that it would be appropriate to assign a duty of care on an entity that did not control who performed the task.  The Court finds that the relevant factors weigh against imposing a duty of care on DHS to supervise or otherwise warn JDFS during the loading of the spreader beam.

Mr. Ziegler opines that DHS's safety manual obligates DHS to analyze hazards associated with rig components, plan how to handle them, and communicate this information to JDFS.  Docket No. 50-5 at 10, ¶ 13.  However, the Court does not

understand Mr. Richardson to argue that the safety manual is the source of a

contractual duty to JDFS and any such argument would be unsupported.[8]   It is

undisputed that Quicksilver, not DHS, contracted with JDFS to transport disassembled

Rig No. 6.   Thus, there was no contractual relationship between DHS and JDFS or Mr.

Richardson so as to give rise to the duty to supervise, advise, or instruct JDFS on how

to move the unmarked rig components.   *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d

66, 74 (Colo. 2004) (discussing circumstances under which contractual relationship

establishes tort duty of care).

    To the extent Mr. Richardson argues that DHS and JDFS have a special

relationship giving rise to a tort duty, the Court disagrees.   Although, as discussed

above, DHS and JDFS may have a landowner/entrant relationship, any duty arising

---

[8]In *Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 103 (Colo. App. 2008), a car owner towed his car to defendant's lot for storage.   Defendant's safety policy forbade customers from having unsupervised contact with cars in the storage lot.   *Id.* Defendant failed to apply its policy with respect to the car owner and allowed the car owner to replace the tires on his car without supervision.   *Id.*   A tow truck operator hired to transport the car was injured when an improperly installed wheel fell off the towed vehicle.   *Id.*   The court noted that, because the tow truck operator regularly did business with defendant, he would reasonably assume that defendant uniformly applied its safety policy.   *Id.* at 105-06.   As a result, the court found that defendant owed a duty to apply its safety policy uniformly and to disclose to third parties when it failed to do so.   *Id.* at 106.   Here, however, Mr. Richardson fails to provide evidence that JDFS had any expectation that DHS's safety policy applied to it.   And Mr. Richardson provides no authority in support of his contention that an entity's safety policy, by itself, creates a duty of care to third parties with which the entity has no contractual relationship. *Compare Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 610 (Tex. 2002) (rejecting argument that mere existence of a safety policy is sufficient to show that general contractor exercised sufficient control over subcontractor so as to give rise to a duty of care to subcontractor's employees); *Calderon v. Residential Homes of Am., Inc.*, 885 N.E.2d 1138, 1148 (Ill. App. Ct. 2008) (suggesting that mere existence of safety manual is insufficient to affect means and manner in which subcontractor performed work and therefore does not impose a duty on general contractor).

from such a relationship is exclusively governed by § 13-21-115.  *See Vigil*, 103 P.3d at

326.  Mr. Richardson does not indicate whether an additional relationship between DHS

and JDFS existed and no such relationship is apparent.  *See Whitlock*, 744 P.2d at 58

(listing recognized special relationships).

Because Mr. Richardson fails to show that a common law duty of care should be

imposed upon DHS in relation to his claimed injuries, Mr. Richardson's negligence and

gross negligence claims must be dismissed.  *See Casey*, 923 P.2d at 368; *Weil v. First*

*Nat'l Bank of Castle Rock*, 983 P.2d 812, 815 (Colo. App. 1999) (dismissing negligence

and gross negligence claims is appropriate where defendant owes no common law duty

to plaintiff).  This aspect of DHS's motion for summary judgment will be granted.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that DHS's Motion for Summary Judgment [Docket No. 47] is

**GRANTED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its

costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.

DATED March 24, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge